**UNITED STATES of America**

v.

**Keith A. McCRORY, Appellant.**

**No. 89–3211.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1990.

Decided April 12, 1991.

Mary E. Davis (appointed by this Court), with whom Christopher M. Davis, Washington, D.C., was on the brief, for appellant.

Barbara J. Valliere, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Nancy Woodward, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before RUTH B. GINSBURG, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge SILBERMAN.

SENTELLE, Circuit Judge:

Keith A. McCrory ("McCrory" or "appellant") was convicted on a one-count indictment for distribution of a mixture of cocaine base in violation of 21 U.S.C. § 841(a) and sentenced to 235 months' imprisonment. On appeal he argues that: (1) the district court erred in calculating his sentence under the United States Sentencing Guidelines ("the Guidelines") when it considered evidence excluded at trial of large quantities of crack cocaine, guns, money, and jewelry seized from his person and the apartment at which he was arrested; (2) the district court erred in denying appellant's motion for mistrial for the government's late compliance with a discovery request; (3) the district court erred in failing to strike testimony which referred to evidence excluded at trial (jewelry confiscated from appellant's person); and (4) the prosecutor's improper comments during closing and rebuttal arguments prejudiced appellant. For the reasons set forth below, we reject each of these challenges and affirm McCrory's conviction and sentence.

## I. BACKGROUND

On February 22, 1989, Metropolitan Police Department Undercover Officers Sean Rollins and Michelle Jones arrived at 870 Southern Avenue, N.E., in Washington, D.C., to buy drugs. The officers approached McCrory in the doorway of Apartment 204 and stated "Connie" sent them to get a "working 50" (slang for $50 worth of crack cocaine). Upon McCrory's invitation, Officers Rollins and Jones entered the living room area of Apartment 204 and re-

peated their request. McCrory went to a back room and promptly returned with several plastic bags, which he dropped into Officer Rollins's hand. The officers inspected the bags, chose the largest one, paid McCrory $50 in prerecorded funds, and departed.

Outside, the officers field-tested the contents of the plastic bag and determined that the substance was 792 milligrams of 70 percent pure cocaine base. Then, the officers broadcast McCrory's description and precise location to an awaiting arrest team. Sergeant James Vucci, a member of the responding arrest team, forcibly entered Apartment 204 and detained McCrory, who matched the broadcast description. Vucci searched appellant's person, removing a gold nugget ring inscribed with the name "Keith" in diamonds, a Seiko watch with a gold leather band, and several gold chains. After Rollins and Jones identified McCrory as the person from whom they had purchased the crack cocaine ten minutes earlier, Vucci arrested him and charged him with cocaine distribution.

McCrory filed a Motion to Suppress Evidence, arguing that because the arrest team broke down the door of Apartment 204 without a warrant, the arrest and subsequent searches of McCrory and the apartment were illegal and the court therefore must suppress all the evidence seized, including the crack cocaine, weapons, and paraphernalia found in the apartment, and a sum of money found on McCrory. The government responded that it would not introduce any evidence seized from McCrory or the apartment in its case-in-chief, reserving the right to address the issue of McCrory's standing to raise the Fourth Amendment claim if it became necessary to use the evidence in cross-examination or rebuttal.

During a pretrial hearing, the government informed the district court that the parties had agreed that it would introduce only evidence supporting the distribution charge in its case-in-chief. The government explicitly stated that it would introduce all of the seized evidence at sentencing, and, should appellant "open the door,"

would seek to introduce the evidence at trial.

At trial, the prosecution's evidence was consistent with the facts set forth above. Appellant presented no evidence. On September 18, 1989, appellant was convicted. At the sentencing hearing, the government contended that the Presentence Investigation Report, which calculated a base offense level of 18, did not take into consideration McCrory's "relevant conduct" as defined by United States Sentencing Commission, *Guidelines Manual*: **Relevant Conduct (Factors that Determine the Guideline Range)**

(a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction; ...

U.S.S.G. § 1B1.3(a)(1) & (2) (1989). The government reasoned that it is a fundamental principle of sentencing under the Guidelines that the court have available all relevant and reliable information regarding the defendant and the offense of conviction to insure that it sets a proper sentence. To support the calculation of McCrory's base offense level, the government introduced all of the evidence seized as well as testimony from several witnesses.

Robin Plater, lessee of Apartment 201, testified by affidavit that several young men from New York, including appellant, had "taken over her apartment" after she had "messed over" some drug money (*i.e.,* accounted for neither the drugs nor the money with which she had been entrusted). The approximately six to ten New York teenagers, with appellant and "Whitey" as ringleaders, used her apartment as a cocaine distribution center. Appellant and Whitey "ran the show." The drugs arrived from New York by truck in large lunch bags and then were split "into G-packs," plastic bags containing $1,000 worth of crack cocaine. Appellant and Whitey distributed the G-packs to the other juveniles who would then go out and sell the crack. Plater further stated that McCrory and the others were armed with "an Uzi, a Tech–22, ... some handguns, [and] sawed-off shotguns" and "had a stash [of crack cocaine] over at Connie's house in apartment 204" along with additional guns.

The government presented a statement from Connie Evans, lessee of Apartment 204 (where the drug distribution and arrest occurred), that she had been living in Apartment 204 with her son, her niece, and her niece's son for approximately three years. Evans left the apartment on February 21, 1989, to visit a friend. On February 22, her niece telephoned and told her that appellant and another man had moved drugs into the apartment and had begun selling them. Evans claimed that she told her niece to direct appellant to remove the drugs from the apartment; that she did not "want to deal with it;" and that she knew appellant and "the New Yorkers were selling drugs" from Apartment 201, but would not let them operate out of Apartment 204.

Detective Hayes testified that he received a telephone call from Robin Plater in which she disclosed the details of McCrory's drug activities out of both apartments.

Investigator Mueller described appellant's arrest and the subsequent search. He testified that after the officers secured Apartment 204 and obtained a search warrant, they searched the apartment and recovered evidence including, *inter alia:* large ziplock bags containing hundreds of smaller ziplock bags filled with crack cocaine; a wide variety of firearms and ammunitions; scales; a walkie-talkie; the $50 in prerecorded funds earlier dispensed to Officer Rollins; and drug paraphernalia. The prosecution had not introduced any of this evidence in its case-in-chief pursuant to the agreement between the parties, but only relied upon the evidence at sentencing to support its position as to the proper calculation of appellant's base offense level. Appellant presented no evidence in rebuttal.

This evidence supported a conclusion that appellant's "relevant conduct" included his possession with intent to distribute the entire amount of crack cocaine, as much as "a kilo and a half" seized from Apartment 204. The district court, therefore, set a base offense level of 36 in accordance with the requirements of the Guidelines §§ 2D1.1(a)(3) & (c)(3), and not 18 as recommended in the Presentence Investigation Report. The court adjusted the offense level upward by two levels to 38 because of the presence of weapons in accordance with the Guidelines § 2D1.1(b)(1), which provides "[i]f a dangerous weapon (including a firearm) was possessed during commission of the offense, increase by 2 levels." Accordingly, the district court placed McCrory in the sentencing range of 235–293 months' imprisonment instead of 27 to 33 months' imprisonment. The court exercised its discretion and sentenced McCrory to 235 months in prison, the lower range of the allowable sentence under the Guidelines, but declined McCrory's request to depart downward from the Guidelines. Had McCrory been tried and convicted on additional drug-trafficking and weapons offenses that the evidence seized from McCrory or Apartment 204 supported, he could have faced a sentence ranging from 248 to 295 months.[1]

---

**1.** McCrory could have been charged and convicted under 21 U.S.C. § 841(b)(1)(A)(iii) (possession of 50 grams or more of a mixture or substance containing cocaine base) and could have received a sentence of ten years to life. Additionally, he could have been charged and

## II. ANALYSIS

### A. *Application of the Exclusionary Rule to Sentencing Proceeding*

McCrory argues that when the district court used evidence seized in the warrantless search to calculate the base offense level under the Guidelines, it violated his rights under the Fourth Amendment. The deterrent function of the exclusionary rule, McCrory urges, justifies its application in the sentencing hearing as well as at trial, because the police officers, in obtaining the illegally seized evidence, operated for multiple purposes. The officers' purposes were: to arrest him for a single count of distributing approximately one gram of crack cocaine; to obtain evidence for additional charges; and, should the effort to obtain more serious convictions fail, to use the seized evidence to push appellant's sentence to a higher base offense level under the Guidelines. McCrory contends that suppressing the evidence at the sentencing hearing is necessary to deter such multipurpose illegal searches.

Precedent runs counter to McCrory's argument. Courts consistently have rejected contentions that the exclusionary rule's emphasis on deterrence means that "anything which deters illegal searches is thereby commanded by the Fourth Amendment." *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). *See, e.g., New York v. Harris*, —— U.S. ——, 110 S.Ct. 1640, 1644, 109 L.Ed.2d 13 (1990); *Illinois v. Krull*, 480 U.S. 340, 347, 107 S.Ct. 1160, 1165, 94 L.Ed.2d 364 (1987); *United States v. Leon*, 468 U.S. 897, 910, 104 S.Ct. 3405, 3413, 82 L.Ed.2d 677 (1984); *Gelbard v. United States*, 408 U.S. 41, 65, 92 S.Ct. 2357, 2370, 33 L.Ed.2d 179 (1972); *United States v. Hunt*, 505 F.2d 931, 935 (5th Cir.1974); *In re Evans*, 452 F.2d 1239, 1274 (D.C.Cir.1971). *See also United States v. Calandra*, 414 U.S. 338, 347–48, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974) ("the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved").

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. Amend. IV. To protect this right, courts have crafted the exclusionary remedy to exclude evidence obtained in violation of the Fourth Amendment in criminal trials. *James v. Illinois*, 493 U.S. 307, 110 S.Ct. 648, 651, 107 L.Ed.2d 676 (1990); *Terry v. Ohio*, 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968); *Mapp v. Ohio*, 367 U.S. 643, 657, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961).

■ However, "[d]espite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *United States v. Calandra*, 414 U.S. at 348, 94 S.Ct. at 620. As the Supreme Court recently reaffirmed in a different context:

> [W]e have declined to adopt a *per se* or "but for" rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest.... Rather, in this context, we have stated that the penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve.

*New York v. Harris*, 110 S.Ct. at 1642–43 (exclusion of criminal suspect's statement made outside home not required even though statement made after warrantless and nonconsensual entry into suspect's home) (internal citations, signals, and quotations omitted). *See also United States v. Calandra*, 414 U.S. at 347, 94 S.Ct. at 619 (grand jury witness may not refuse to answer questions on the ground that they are based on evidence obtained from an unlawful search and seizure).

---

convicted under 18 U.S.C. § 924(c) (possession of a firearm during and in relation to a narcotic offense) and could have received a five-year sentence to run consecutively to the first.

Historically, in determining guilt, courts have been limited by strict evidentiary requirements. "Both before and since the American colonies became a nation," however, courts have exercised "wide discretion in the sources and types of evidence used to assist [them] in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949) (footnote omitted). Thus, it is a " 'fundamental sentencing principle' that ' "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." ' " *United States v. Campbell*, 684 F.2d 141, 152 (D.C.Cir.1982) (quoting *United States v. Grayson*, 438 U.S. 41, 50, 98 S.Ct. 2610, 2615, 57 L.Ed.2d 582 (1978)).

In trial, where the question is whether a defendant is guilty of committing the crime of which he is accused, rules of evidence restrict the evidence to that strictly relevant to the particular offense charged. *Williams v. New York*, 337 U.S. at 246, 69 S.Ct. at 1082. Once the trier of fact has adjudicated the defendant's guilt, however, the judge must have the fullest information available concerning the defendant's background in order to fashion the most appropriate sentence. *Id.* at 247, 69 S.Ct. at 1083. Accordingly, the sentencing judge must be allowed to consider pertinent information free of the constraints of evidentiary rules applied at trial. *Id.*

Although *Williams, supra,* was decided before the adoption of the Sentencing Guidelines, the rationale remains applicable. *See United States v. Torres*, 926 F.2d 321, 325 (3d Cir.1991) (evidence suppressed at trial for violation of Fourth Amendment may be considered in determining base offense level under the Guidelines); *United States v. Taplette*, 872 F.2d 101, 106 (5th Cir.) (Guidelines allow court to consider relevant conduct for which the defendant was not convicted in determining the Guideline range), *cert. denied,* —— U.S. ——, 110 S.Ct. 128, 107 L.Ed.2d 88 (1989); *United States v. Scroggins*, 880 F.2d 1204,

1209–10 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990); *United States v. White*, 888 F.2d 490, 496 (7th Cir.1989); *United States v. Ykema*, 887 F.2d 697, 699 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990); *United States v. Allen*, 886 F.2d 143, 145–46 (8th Cir.1989); *United States v. Williams*, 880 F.2d 804, 806 (4th Cir.1989); *United States v. Ryan*, 866 F.2d 604, 609 (3d Cir.1989). Congress has explicitly endorsed this view: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3577 (recodified without change at 18 U.S.C. § 3661). Moreover, the Guidelines reiterate:

> In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661.

U.S.S.G. § 1B1.4. Thus, evidence inadmissible at trial may be admissible at sentencing. Additionally, the Guidelines require the court to consider "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). In the present case, the court properly considered the total quantity of crack cocaine attributable to McCrory, more than a kilo and a half, in setting the base offense level at 36, without regard to the seizure of the evidence.

As one of our sister circuits has reasoned: "If the exclusionary rule were extended to sentencing in the ordinary case, its additional deterrent effect would be so minimal as to be insignificant." *United States v. Lee*, 540 F.2d 1205, 1211 (4th Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976). *Accord, United States v. Torres*, 926 F.2d 321, 325 ("desirability of reaching an appropriate decision in sentencing outweighs what little deterrent ef-

fect may be present"); *United States v. Graves,* 785 F.2d 870, 873 (10th Cir.1986) ("extension of the exclusionary rule to sentencing or post-sentencing proceedings before federal agencies would, in the ordinary case, have a deterrent effect so minimal as to be insignificant"); *United States v. Butler,* 680 F.2d 1055 (5th Cir.1982) (sentencing judge properly considered fruits of an illegal search in sentencing because deterrent value of excluding illegally obtained evidence at sentencing substantially less than at trial); *United States v. Schipani,* 435 F.2d 26, 28 (2d Cir.1970) (proper for court to consider at sentencing evidence excluded from trial on Fourth Amendment grounds).

■ As these other circuits have done in determining whether to extend the exclusionary remedy to the sentencing context, we inquire whether the deterrent effect achieved will outweigh the detrimental effects of excluding the reliable evidence on the court's ability to achieve the goals of appropriate sentencing. *Torres,* 926 F.2d at 325. *See generally* 18 U.S.C. § 3553(a) (setting forth factors to be considered in sentencing). *See also James v. Illinois,* 110 S.Ct. at 657 (discussing balancing approach); *Illinois v. Krull,* 480 U.S. at 347, 107 S.Ct. at 1165 (same); *United States v. Leon,* 468 U.S. at 908–13, 104 S.Ct. at 3412–15 (same).

■ We hold that under the circumstances of this case the deterrent effect would not outweigh the detrimental effect of excluding the evidence. The police officers obtained a search warrant before the search of the apartment. Any illegality resulted from the earlier warrantless entry of Apartment 204 to arrest McCrory. Where there is no showing of a violation of the Fourth Amendment purposefully designed to obtain evidence to increase a defendant's base offense level at sentencing, this police misconduct is not sufficient to justify interfering with individualized sentencing. The government concedes that some "irregularity" occurred when the officers obtained evidence in the warrantless entry to arrest McCrory. That evidence was excluded from the trial. That exclusion sufficed in this case to vindicate the

purpose of the rule. *See New York v. Harris,* 110 S.Ct. at 1644. Further suppression at the sentencing phase was not necessary to that vindication. In so ruling, we leave open the question whether suppression would be necessary and proper at the sentencing phase where it is shown that the police acted egregiously, *e.g.,* by undertaking a warrantless search for the very purpose of obtaining evidence to increase a defendant's sentence. *See Verdugo v. United States,* 402 F.2d 599, 611–13 (9th Cir.), *cert. denied,* 397 U.S. 925, 90 S.Ct. 931, 25 L.Ed.2d 105 (1968) (evidence excluded from sentencing consideration when search conducted without a warrant was "blatantly illegal," and court found that police needed to be deterred from making illegal searches under circumstances involved); *but see United States v. Vandemark,* 522 F.2d 1019, 1022–25 (9th Cir. 1975) (limiting holding of *Verdugo* to cases in which use at sentencing of illegally seized evidence *"would provide a substantial incentive for unconstitutional searches and seizures "*) (emphasis added).

### B. *Appellant's Other Claims*

■ McCrory argues that the district court erred in failing to grant his motion for mistrial because the government's belated compliance with his discovery request to produce "physical evidence regarding any pretrial identification" prejudiced his substantial rights and violated Rule 16 of the Federal Rules of Criminal Procedure. The evidence in question was relevant only to a defense theory not immediately obvious to the prosecution or to the trial court. The government responds that it is not obligated under Rule 16 to anticipate every possible defense and to produce—without specific request—seemingly irrelevant material.

Reversal of McCrory's conviction because of the alleged discovery violation is not warranted. McCrory suffered no prejudice to his substantial rights. *See United States v. Glover,* 846 F.2d 339, 343 (6th Cir.) (government failure to disclose evidence as required by reciprocal discovery order is not reversible error where it only

limits the cross-examination of a government witness), *cert. denied*, 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 565 (1988); *United States v. Brodie*, 871 F.2d 125, 129 (D.C.Cir.1989) (government failure to provide defendant with printed transcript of tape of secretly recorded conversation is not reversible error absent specific request and demonstration of prejudice).

McCrory's counsel based his defense on a theory of misidentification. The officers testified that the person from whom they bought the crack cocaine wore gold chains around his neck. They identified appellant as the person from whom they had purchased the crack cocaine when Sergeant Vucci conducted him to the front of the apartment building prior to his arrest. Because the police did not disclose in their report that they removed gold chains from McCrory upon his arrest, his counsel intended to argue that they must have misidentified him as the person selling the crack cocaine. At trial, however, the Sergeant's testimony included reference to the jewelry. Thus, the defendant's intended argument became unavailable.

The district court properly exercised its discretion to remedy the violation by: (1) prohibiting the government from introducing the gold chains in its case-in-chief; and (2) allowing appellant to cross-examine all government witnesses on the existence of the gold chains, rather than by granting appellant's request for a mistrial. *See United States v. Turner*, 871 F.2d 1574, 1580 (11th Cir.1989) (district court's exercise of broad discretion to enforce discovery order will not be reversed unless abuse of discretion). There is, after all, no right to deceive a jury as to the true facts.

We have examined appellant's other arguments, and conclude that none warrants separate discussion or reversal.

### III. CONCLUSION

We conclude that the exclusionary rule generally does not bar the use of illegally obtained evidence to calculate the base offense level under the Sentencing Guidelines. Additionally, we reject appellant's other arguments. Appellant's conviction and sentence are therefore

*Affirmed.*

SILBERMAN, Circuit Judge, concurring in part and concurring in the judgment:

I regard McCrory's Fourth Amendment claim as substantially more difficult than do my colleagues. The police and prosecution tactics employed in this case may not require reversal of McCrory's sentence but they are certainly troublesome. Two undercover officers purchased a small amount of crack cocaine from McCrory in an apartment. They then broadcast the location of the apartment, and a veritable SWAT team descended upon it, carrying everything except a search warrant, and conducted what the government has conceded was an unconstitutional search in which they found a large cache of drugs and guns.

The prosecution readily agreed not to use this evidence at trial, and McCrory was indicted and tried only on the small drug sale. The illegally-seized evidence, however, was introduced at the sentencing phase as "relevant conduct" under the sentencing guidelines, and McCrory predictably received almost the precise sentence he would have gotten had he been indicted, tried, and convicted for possession of all the drugs and guns in the apartment.[1] McCrory claims, understandably, that a

---

**1.** The guidelines provide for enhancement of a defendant's "offense level" by all "relevant conduct"—defined as all acts and omissions by the defendant in furtherance of the charged offense, *see* United States Sentencing Guidelines § 1B1.3(a)(1) & (2)—proven by a preponderance of the evidence (*e.g.*, possession of additional quantities of drugs). As the offense level for drug offenses is a function of the total amount of drugs involved without regard to the proportion associated with charged or with relevant conduct, this process results in the offense level (and, depending on the statutory maximum for the charged offense, the sentence) being the same whether the defendant is tried and convicted on all the drugs involved or whether he is tried and convicted on only a portion and the rest is brought in at sentencing as relevant conduct.

more patent end-run around the exclusionary rule is hard to imagine.

The exclusionary rule, as matters currently stand, is in certain circumstances a mandatory remedy for a Fourth Amendment violation, *see Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). And those circumstances are determined by reference to "whether the [exclusionary] rule's deterrent effect will be achieved, and ... [a balance] of the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process." *Illinois v. Krull,* 480 U.S. 340, 347, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). Where this balance indicates that exclusion of the evidence is necessary to offset an unacceptably high incentive for police to violate the Fourth Amendment, the rule applies irrespective of whether the *particular* search or seizure involved in the case was in fact motivated by that incentive; the rule is a prophylactic. *See, e.g., United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974).

Before promulgation of the sentencing guidelines, this balance tipped toward admissibility at sentencing of illegally-seized evidence. *See United States v. Graves,* 785 F.2d 870 (10th Cir.1986); *United States v. Butler,* 680 F.2d 1055 (5th Cir.1982); *United States v. Lee,* 540 F.2d 1205 (4th Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976); *United States v. Schipani,* 435 F.2d 26 (2d Cir.1970). Even if district judges could take illegally-seized evidence into account at sentencing, the final sentence was almost entirely at their discretion (within generally broad statutory maxima and minima), and there was thus not much predictability as to the consequence of putting this kind of evidence before them, *see generally Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 651, 102 L.Ed.2d 714 (1989) (discussing the unpredictability of pre-guidelines sentences). There was thought to be little

deterrent justification for excluding the evidence at the sentencing phase. In a sense the very arbitrariness in the sentencing process that led to the promulgation of the guidelines meant that law enforcement officials would not be likely to seize evidence illegally and then refrain from charging crimes based upon it and instead introduce that evidence only at sentencing.

In the post-guidelines world, however, the government's motivation might well be somewhat different, especially when (as here) the prosecution has more than enough evidence to convict the defendant on a lesser charge *before* they conduct the illegal search. The prosecution will know, based upon the indictment it urges and the "extra" evidence it has, almost exactly what the sentence will be in the event of conviction because of the guidelines' mandate that the sentence be increased by a specific number of offense levels in light of other "relevant conduct" proven by a preponderance of the evidence. This means the police and prosecution now have something of an incentive to seize evidence illegally and then introduce that evidence only at the sentencing phase (unless the exclusionary rule applies at sentencing). If the police and prosecution know beforehand that they can get a conviction on a relatively minor offense which has a broad statutory sentencing range and that they can guarantee a sentence near the maximum by seizing other evidence illegally and introducing it at sentencing, there is nothing to deter them from seizing the evidence immediately without obtaining a warrant, especially when a conviction on a "greater" crime would lead to a similar sentence.[2]

I think what my colleague Judge Williams calls "truth-in-judging," *Walsh v. Brady,* 927 F.2d 1229, 1238 (D.C.Cir.1991) (Williams, J., concurring), obliges us to recognize this analytical problem, but I confess I do not have a very satisfactory answer to it. The majority seems not to

---

**2.** By contrast, in the sole post-guidelines case cited by the majority dealing with the application of the exclusionary rule at sentencing, *United States v. Torres,* 926 F.2d 321 (3d Cir. March 1, 1991), this incentive was not present. There, *all* the physical evidence against the defendant

had been seized in the same warrantless search. *See* at 322. The police therefore could not have known before the search that they had sufficient evidence to convict, and the possibility of suppression of the seized evidence at trial would thus have constituted deterrence enough.

recognize that the guidelines change the government's incentive structure and therefore implicate the basic rationale of *Mapp v. Ohio.* Accordingly, the majority's suggested safety valve—holding open the question whether suppression is necessary if it can be shown that the police understood an illegal search "for the very purpose of obtaining evidence to increase a defendant's sentence," Maj.Op. at 69—is quite inconsistent with *Mapp*'s logic. The exclusionary rule is a prophylactic; it applies across the board in situations where the incentives for the police and the deterrence provided by the rule are such that exclusion is required and without reference to what motivated the particular search at issue. The majority would turn the exclusionary rule—at least in this context—into a form of subjective inquiry into police motivation.

In any event, the majority's tentative limiting principle appears to me to be a chimera. It reminds me of what was often said of Chinese–American food of forty years ago—it leaves you empty shortly after reading. I cannot imagine how a defendant could ever show that the police illegally broke in to search his house for the very (and presumably sole) purpose of enhancing his sentence. In these drug cases the police and prosecutors wish to shut down the crack houses as well as make arrests, gain convictions, and seek severe sentences. I doubt whether we will ever see a stronger case for application of the exclusionary rule to the sentencing proceedings than here, where the break-in occurred after the police had already obtained sufficient evidence to convict the defendant.

Nevertheless, I do not dissent. The Supreme Court in recent years has been extremely hesitant to extend the exclusionary rule, *see, e.g., New York v. Harris,* —— U.S. ——, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990); *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); *but see James v. Illinois,* 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990), and particularly to extend it to non-trial proceedings, *see, e.g., INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (deportation proceedings); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (habeas corpus review); *Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (grand jury proceedings). Congress, moreover, has expressly stated that "[n]o limitation" shall be placed on the evidence a sentencing judge may consider, 18 U.S.C. § 3661, which is an implicit challenge to the extension of the exclusionary rule to sentencing procedures. Since the Supreme Court currently views the rule to be a remedial device rather than a constitutional right of a defendant, *see, e.g., Calandra,* 414 U.S. at 347, 94 S.Ct. at 619, I think it unlikely that the Court would override congressional desires, at least so long as other remedies to deter unconstitutional behavior (*e.g., Bivens* actions) were available.[3] In sum, I concur in the judgment but think it important to recognize that we are taking a big bite out of the exclusionary rule.

---

**3.** To be sure, it is hard to understand why state legislatures should not have the same latitude as Congress, which may mean that *Mapp v. Ohio* will have to give way in a sentencing context—if it survives at all.