**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gregory D. JORDAN, Defendant–**
**Appellant.**

**No. 00–1135.**

United States Court of Appeals,
Sixth Circuit.

Sept. 18, 2001.

Before MARTIN, Chief Circuit Judge, NELSON, Circuit Judge, and RICE,* District Judge.

## OPINION

RICE, District Judge.

Gregory D. Jordan appeals from his conviction and sentence in the United States District Court for the Eastern District of Michigan, Southern Division, for conspiracy to defraud the food stamp program.

### I. Factual Background

The government charged Jordan with conspiring to defraud the food stamp program and forty-four counts of trafficking in food stamps and aiding and abetting in the same. JA at 19. Numerous other individuals also were charged as a result of a year-long investigation at "Cash Express," a Detroit-area establishment where food stamps were distributed to participants in the federal food stamp program. *Id.* The food stamps were distributed to recipients on the first ten days of each month. Surveillance tapes showed that during the distribution cycle, approximately twelve to fifteen traffickers would congregate at Cash Express in order to purchase food stamps from the intended recipients. *Id.* at 175. Jordan and the other traffickers engaged in cooperative efforts when purchasing the food stamps. They sometimes shared money or food stamps. *Id.* at 100. They also sometimes served as go-betweens or "runners," helping pair recipients with other traffickers. *Id.* at 130. Jordan himself collected stamps from other traffickers and sold them to an establishment known as "Tony's Beverage Shop." *Id.* at 100.

The government conducted its surveillance on thirty-three days. Jordan was seen trafficking in food stamps on thirty of those days. *Id.* at 153. On eighty-eight occasions, government agents saw Jordan engage in illegal food stamp transactions, and on fourteen occasions he engaged in trafficking with an undercover witness. *Id.* at 155. According to the government, Jordan ranked first in culpability among the traffickers at Cash Express. *Id.*

Jordan ultimately pled guilty to the count charging him with conspiracy to commit food stamp fraud. *Id.* at 93–103. At his sentencing hearing, he stipulated that the total fraud loss for the conspiracy to which he entered his plea was $3,075,000. *Id.* at 109–10. He also agreed that the daily fraud loss, based upon the district court's calculations, was $25,633.[1] *Id.* The district court then determined the fraud loss for which Jordan was responsible by multiplying the daily total fraud loss by thirty, which represented the number of days that Jordan was observed on surveillance tapes. In other words, the district court found Jordan responsible for the entire estimated fraud loss that occurred at Cash Express on any day that he was present at all. This amount was $768,990. *Id.* at 218–20. The district court then determined that Jordan was present much more than the thirty days he was caught on tape. As a result, the court accepted the probation department's recommendation that he should be found responsible for a fraud loss of more than $800,000 but less than $1,500,000. *Id.* at 220–22. The district court ultimately sentenced Jordan to forty-eight months in

---

* The Honorable Walter H. Rice, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

1. The district court arrived at this figure by dividing the total amount of fraud loss by 120 days, which represented the total number of food stamp issuing days during the time covered by the indictment (i.e., the first ten days of the month for one year).

prison to be followed by three years of supervised release. *Id.* at 240. Jordan then filed this timely appeal. *Id.* at 92.

## II. Issues for Review

Jordan presents two issues for our review: (1) whether the district court erred when it determined the relevant conduct for which he was responsible; and (2) whether the district court erred by requiring the government to prove his relevant conduct by a preponderance of the evidence rather than by clear and convincing evidence.

## III. Analysis

As noted above, for purposes of adjusting Jordan's offense level based on his "relevant conduct," the district court first found him responsible for the entire estimated fraud loss on every day that he was present at Cash Express, which amounted to $768,990. The district court then found Jordan responsible for an additional amount of fraud loss, based upon its finding that he was present more than the thirty times caught on tape. As a result, the district court held that the total fraud loss attributable to Jordan was more than $800,000 but less than $1,500,000.

On appeal, Jordan contends that the district court miscalculated his relevant conduct (i.e., the amount of fraud loss attributable to him). As Jordan properly notes, the applicable portion of the Sentencing Guidelines is § 1B1.3(a)(1)(B), which provides that a defendant's relevant conduct includes:

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity ....

After citing § 1B1.3(a)(1)(B), Jordan argues that his relevant conduct under that section should include only the "face value" of the eighty-eight food stamp trafficking transactions in which the government proved his actual participation. The total fraud loss from these transactions was $8,800. In response, the government insists that the district court correctly computed the fraud loss attributable to Jordan, in accordance with § 1B1.3(a)(1)(B), when it found him responsible for (1) the entire loss that occurred on any day that he was present at all (rather than just the fraud loss resulting from the eighty-eight transactions in which he participated) and (2) an additional amount to account for the court's finding that he was present much more often than the surveillance tapes showed.

Having reviewed the record, we conclude that the district court misapprehended the law when it determined the fraud loss properly attributable to Jordan. In *United States v. Jenkins,* 4 F.3d 1338, 1346 (6th Cir.1993), this court recognized that under § 1B1.3(a)(1)(B), a conspirator may be held responsible for the acts of co-conspirators that are both (1) reasonably foreseeable and (2) in furtherance of jointly undertaken criminal activity. The government must prove foreseeability and the scope of the jointly undertaken criminal activity by the preponderance of the evidence. *Wright v. United States,* 182 F.3d 458, 467 (6th Cir.1999). In *Jenkins,* we noted that the scope of a defendant's jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy." *Jenkins,* 4 F.3d at 1347 (quoting § 1B1.3 at Application Note 2). In other words, "jointly undertaken criminal activity" for purposes of determining relevant conduct may differ from the conduct forming the conspiracy itself. Indeed, this court has recognized that " 'the

scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy .... ' " *United States v. Milsaps*, 188 F.3d 509, 1999 WL 701903 (6th Cir. Sept.2, 1999) (unpublished), quoting *United States v. Okayfor*, 996 F.2d 116, 120–121 (6th Cir.1993). As a result, " '[i]n order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court first must determine the scope of the criminal activity the particular defendant agreed to jointly undertake .... ' " *Jenkins*, 4 F.3d at 1347 (quoting § 1B1.3 at Application Note 2). Absent such a finding, a remand is appropriate to allow a district court "to address the criteria of U.S.S.G. § 1B1.3 and determine the scope" of the jointly undertaken criminal activity. *Id.; see also United States v. Meacham*, 27 F.3d 214, 217 (6th Cir.1994) (same).

In the present case, Jordan's counsel attempted several times to explain the distinction between "jointly undertaken criminal activity" for purposes of the Sentencing Guidelines and the conduct comprising the conspiracy itself. During Jordan's sentencing hearing, the following exchange took place between the court and defense counsel Jonathan Epstein:

MR. EPSTEIN: ... What I'm saying is, and I just want to repeat what is stated in U.S.S.G. 1B1.3, and that is,

"Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant is not necessarily the same as the scope of the entire conspiracy."

So I think we can agree that there was a conspiracy in this case. But what is Mr. Jordan's-what is the scope of his participation within the criminal-

THE COURT: Oh, I don't think the law says it's the scope of his participation at all. That's not what the law says. The law indicates that he could be held responsible-let me just cite *U.S. v. Brown*, 147 F.3d 477, Sixth Circuit 1998,

"A conspirator is liable for the acts and omissions of his co-conspirators that are reasonably foreseeable and in furtherance of the conspiracy," unquote.

That's the law. Not what was his scope. The Sixth Circuit didn't say anything about his scope. *He is responsible for the acts of all of the coconspirators that are reasonably foreseeable and in furtherance of the conspiracy.* It's way beyond his scope as you define it.

... This isn't anything new. This is the basic law that I've been dealing with in every conspiracy case I've had since I've been on the bench. I've never had a defense lawyer argue that that's not the law. So I don't know what you're doing here arguing something else. If you've got a case that says differently, tell me about it.

MR. EPSTEIN: Well, I've cited *Jenkins*. I don't have the actual text of the case in front of me, but I know that *Jenkins* states that there's a two-prong test. First, what is within the scope of the criminal activity the defendant agreed to jointly undertake.

THE COURT: Jointly undertake. I don't have a problem with that. *That's the whole conspiracy.* That's fine.

... Counsel, I'm really disappointed that you're not aware of the fact that a conspirator can be held liable for the acts of other conspirators. Are you saying that you don't know that's the law?

MR. EPSTEIN: Your Honor, you're misunderstanding my position.

THE COURT: Okay.

MR. EPSTEIN: My position is that when Mr. Jordan meets with Mr. Butler and loans him ten bucks and Mr. Butler goes and buys some food stamps, Mr. Jordan is responsible for that, even though he didn't derive any gain, he didn't-he is responsible because that was a jointly undertaken criminal activity.

THE COURT: That's not what I'm saying to you. Okay. I'm saying to you, aren't you aware the law is that he's liable for the acts of the other conspirators, even if he had no direct involvement with them?

MR. EPSTEIN: *Only if they were jointly undertaken.*

THE COURT: *No. If they're reasonably foreseeable and in furtherance of the conspiracy. No question about what the law is.* So I don't know what you're arguing.

... The law is still the same as I told you, plain and simple. I quoted it to you. *You're liable for the acts of the other conspirators, regardless of whether you were there at the time, as long as it's reasonably—as long as their acts are reasonably foreseeable and in furtherance of the conspiracy. That's it. Right or wrong, that's the law I'm applying.*

MR. EPSTEIN: Your Honor, I-

THE COURT: And I'm shocked that you didn't come here saying, "Judge, I know that's the law and let me tell you why it's not applied."

Go ahead.

MR. EPSTEIN: Judge, my only disagreement with the Court, and I respectfully disagree, is that that activity has to be jointly undertaken criminal activity.

THE COURT: Whatever that means. JA at 202–09 (emphasis added).

In light of *Jenkins* and the other cases cited, *supra*, the district court erred in its application of the law. Contrary to the district court's conclusion, for purposes of the "relevant conduct" Sentencing Guideline, § 1B1.3, a defendant *is not* necessarily responsible for all acts of other conspirators that are reasonably foreseeable and "in furtherance of the conspiracy." Rather, for sentencing purposes, a defendant is responsible for all acts of other conspirators that are reasonably foreseeable and within the scope of "jointly undertaken criminal activity." As *Jenkins* and the other cases discussed above make clear, and as defense counsel repeatedly attempted to explain, the scope of jointly undertaken criminal activity may be significantly narrower than the scope of the entire conspiracy.

In the district court's defense, the case upon which it relied, *United States v. Brown*, 147 F.3d 477 (6th Cir.1998), does state: "It is clear under U.S.S.G. § 1B1.3(a)(1)(B) that a conspirator is liable for the acts and omissions of his co-conspirators that are reasonably foreseeable and in furtherance of the conspiracy." *Id.* at 485. The foregoing statement from *Brown* inaccurately paraphrases § 1B1.3(a)(1)(B). As recognized in *Jenkins*, § 1B1.3(a)(1)(B) actually states that a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[.]" Furthermore, as explained in the Application Notes following § 1B1.3 and the Sixth Circuit case law discussed above, the phrase "jointly undertaken criminal activity" is significantly narrower than the phrase "the conspiracy." As a result, the district court erred in relying on *Brown's* inaccurate statement of the Sentencing Guidelines. Given that the

district court misapprehended the law, the captioned cause will be remanded for the required determination of the scope of the "jointly undertaken criminal activity" in which Jordan participated. *Cf. Jenkins*, 4 F.3d at 1347 (remanding for re-sentencing "to give the district court an opportunity to address the criteria of U.S.S.G. § 1B1.3 and to determine the scope of the criminal activity [the defendant] agreed to undertake"); *see also United States v. Gray*, 16 F.3d 681, 683 (6th Cir.1994) ("A misapplication of the Guidelines by a district court warrants a remand 'for further sentencing proceedings with such instructions as the court considers appropriate[.]'") (quoting 18 U.S.C. § 3742(f)(1)); *Williams v. United States*, 503 U.S. 193, 202, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992) (recognizing that 18 U.S.C. § 3742(f)(1) requires a remand when a defendant's sentence is the "result of an incorrect application of the Guidelines").[2]

■ With respect to the second issue raised by Jordan, the district court did not err in applying the preponderance of the evidence standard to determine his relevant conduct. Jordan cites *United States v. Watts*, 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam), in which the Supreme Court held that the preponderance standard "generally satisfies due process" at sentencing but recognized "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." Jordan contends that the district court's relevant conduct and fraud loss determinations dramatically increased his punishment, thereby presenting an "extreme case" that required proof by clear and convincing evidence.

Upon review, we find Jordan's argument to be unpersuasive. In *United States v. Ward*, 190 F.3d 483 (6th Cir.1999), this court addressed the foregoing issue, analyzing it under a "plain error" standard, because the defendant had failed to object before the district court. In *Ward*, we reasoned that the lower court *did not err*, much less commit plain error, when it applied the preponderance of the evidence standard. *Id.* at 492; *see also United States v. August*, 984 F.2d 705, 714 (6th Cir.1992) ("[T]his circuit has held numerous times that the preponderance of the evidence standard is the correct and ap-

**2.** In *Williams*, the Supreme Court recognized that a remand may not be required under § 3742(f)(1) if "the reviewing court concludes, on the record as a whole, that the error was harmless, *i.e.*, that the error did not affect the district court's selection of the sentence imposed." *Williams*, 503 U.S. at 203, 112 S.Ct. 1112. In other words, § 3742(f)(1) "does not call for a remand every time a sentencing court might misapply a provision of the Guidelines; rather, remand is required only if the sentence was 'imposed *as a result* of an incorrect application' of the Guidelines." *Id.* at 202–03. As the party defending Jordan's sentence, the United States bears the burden of persuading us that the district court would have imposed the same sentence had it correctly applied § 1B1.3. *Id.* In the present case, the United States has failed to meet this burden. Rather than arguing that the district

court's misapplication of § 1B1.3 was harmless error, the government insists on appeal that the district court understood and properly applied the Sentencing Guidelines. *See, e.g.*, Appellee's Brief at 22. This assertion is belied by the district court's exchange with defense counsel during Jordan's sentencing hearing. In any event, upon reviewing the record as a whole, we cannot say that the district court necessarily committed harmless error when it equated "jointly undertaken criminal activity" with the entire conspiracy. Determining the extent of Jordan's "jointly undertaken criminal activity" requires a factual analysis that the district court failed to undertake. In our view, the district court should have the opportunity to address this issue in the first instance. *Jenkins*, 4 F.3d at 1347.

propriate standard for sentencing under the guidelines."). Consequently, the district court properly applied the preponderance of the evidence standard in the present case.[3]

## IV. Conclusion

Based on the reasoning and citation of authority set forth above, Jordan's sentence is vacated and the captioned cause is hereby remanded for re-sentencing, after the district court makes the findings required by U.S.S.G. § 1B1.3.

DAVID A. NELSON, Circuit Judge, concurring.

I agree that this case should be remanded for a determination of the scope of the criminal activity jointly undertaken by defendant Jordan in concert with others.

In many conspiracy cases—and perhaps in most—the scope of the jointly undertaken criminal activity will be the same as that of the charged conspiracy. I assume that this was the situation in *United States v. Brown*, 147 F.3d 477 (6th Cir.1998), and it may well be the situation in the case at bar as well. But here the comments of the district judge reflect an understanding that, as a matter of law, jointly undertaken criminal activity necessarily corresponds in scope to the entire conspiracy. This is not correct, according to the Sentencing Commission. We cannot be sure what view the district judge would take of the scope of the jointly undertaken criminal activity had the judge understood the Commis-

sion's position—and this uncertainty, in my view, justifies the remand. Accordingly, and because I agree that it was appropriate to determine Jordan's relevant conduct under a "preponderance of the evidence" standard, I concur in the judgment and in the opinion Judge Rice has written for the court.

---

3. Even if this court were to adopt the clear and convincing evidence standard in an "extreme case," the present case would not qualify. Jordan contends that the district court increased the fraud loss from the $8,800 that he conceded to more than $800,000 (a nine-level difference under the fraud loss table). As the government notes, however, the district court cited testimony indicating that Jordan sold $700 to $800 worth of food stamps twice a day, every day, for the first two weeks of each month. JA at 211–14. In light of this testimony, Jordan's attorney admitted a fraud loss of $168,000. *Id.* at 214. For purposes of sentencing, the difference between a fraud loss of $168,000 and a fraud loss of more than $800,000 but less than $1,500,000 is relatively small and certainly not "extreme." *See* U.S.S.G. § 2F1.1(b)(1).